## DAVIS v. LOUISIANA HIGHWAY COMMISSION.

No. 1033.

Court of Appeal of Louisiana. First Circuit.

Oct. 5, 1932.

Columbus Reid, of Hammond, for appellant.

Mat J. Allen, of Amite, for appellee.

LE BLANC, J.

Plaintiff, an employee of the Louisiana highway commission, was injured during working hours, on the evening of October 16, 1930. He alleges that he was being transported to his boarding house on a truck furnished by his employer for that purpose, that it was run into an open bridge by the party who was driving it, and that in the wreck he sustained severe injuries to his left breast, his spinal column, and hips, and to his nerves and ligaments. In addition, he

suffered a fracture of two or more ribs, of the left arm in two places, and also contusions and burns over various parts of the body. He asks for compensation as for total disability, for a period of 400 weeks at $11.71 per week, less the sum of· $374, the amount of compensation paid him during 32 weeks, or to May 18, 1931.

The serious defense is that the plaintiff is not entitled to further compensation than what has already been paid to him for the reason that he is fully able to do work of a reasonable character and has been able to do so since January 19, 1931.

A defense such as this in a suit of this nature generally presents an issue which has to be solved from the medical testimony in the case.

The lower court rendered judgment in favor of the plaintiff granting him compensation at the rate per week as prayed for, for a period of 150 weeks, and also allowed him $250 for medical expenses. The defendant appealed, and plaintiff answered asking that the judgment be amended by increasing the period of compensation to 368 weeks.

 The testimony of the several doctors is limited to their findings with regard to the injury to the spinal column. Plaintiff himself refers to his arm having· been fractured and not having joined perfectly in healing. He also complains about his chest bothering him. It would seem, however, that, if there was any further impairment or disability resulting from such injuries, they would have been observed at least by the physicians who testified in his behalf. The fact that no mention is made of them by any of the witnesses save himself leads us to believe that they no longer produced any ill effects and that the only injury with which we are concerned at this time is that to the back. In the medical testimony, this injury is referred to as a fracture of the left transverse processes of the third and fourth lumbar vertebræ. These are small bones projecting from each side of the spinal column to which the muscles of the back are attached. It may readily be assumed that a fracture of one or two of these bones could be the source of much trouble and suffering and cause disability. The question here presented, however, is, Have these fractures healed entirely, or has the healing process reached the point where it may be said that the patient is no longer suffering any ill effects and is no longer incapacitated from doing manual work?

The theory on which Dr. Overton, plaintiff's principal witness, seems to rest his conclusion that there is enough pain and suffering to cause some degree of disability, is that some of the principal nerves that supply the leg of the injured side emerge from the spinal cord and pass out from the protection of the spinal column in the immediate neighborhood of his injury. "At the time this injury took place," he states, "there was blood extravasated about the site of the injury, and it logically follows that a scar was formed in the processes at the time nature attempted to heal the injury, and it is logical to assume that the nerves pressed over as a result of the scar." We understand this to mean that the pain plaintiff complains of comes from certain nerve pressure in the region of the fractured transverse processes, and yet, when we come to examine the testimony of all other physicians in the case, we learn that there are no nerves in that part of the body, or, to be more exact, by using the language of Dr. Simon, "There are no nerves around the site of the fracture." On this point the testimony of Dr. McClendon is not as clear as that of the other doctors, but even he on cross-examination states that there are no long nerves emanating from the spinal column as far down as the site of the injury in this case. Obviously, on this point we cannot accept Dr. Overton's testimony as against that of all other physicians who testified in the case.

Dr. Overton's testimony otherwise is not so clear when we come to analyze it. He first examined plaintiff in June, 1931, which was about eight months after he had been injured. He found him suffering from the result of an old fracture, referring to the injury to the lumbar spine. There was still a limitation of movement in the spine with a profession of pain, "a subjective sensation," as he calls it. He found him still suffering from the effects of the injury, "in a great deal less degree," however, but he was still more or less incapacitated from doing the work that he was accustomed to. Then, on cross-examination, he at once admits that plaintiff's physical vigor and muscular development are unimpaired and that his appearance is one of general health and vigor. It strikes us that a man presenting an appearance of general health and vigor is one who would not be ordinarily classed as a disability, and, unless the witness meant to convey the impression that, in this case, the appearance was deceiving, we are at a loss to understand his testimony on this particular point.

Dr. McClendon, testifying from the X-ray pictures filed in evidence, finds that they show a fracture of the second, third, and fourth transverse processes, of which the fourth is completely healed, the second shows good signs, and the third is not completely healed. He states that, in the healing process of bones, there is what is called ossified healing and fibrous union. Ossified healing, as we understand him, means that the fractured member or bone has been restored to its original bone substance. When there is

only a fibrous union, sometimes it remains so. That means that it is not hard nor soft. We take it, therefore, that he is of the opinion that the third transverse process at least, and most probably the second, had not yet formed a bony union, and that in such condition a man with that kind of injury is often seriously hurt; when it is a severe one, it very nearly incapacitates him to do manual labor. Even though there were perfect healing of the processes, he hesitates to say how well plaintiff would be. In the latter part of his testimony, Dr. Mc Clendon stresses the fact that his opinion is based on a reading of the X-ray plates and the reports of other doctors in the case, and not from any physical examination. When pressed for his estimate as to plaintiff being permanently injured, he finally says: "I reckon about twenty-five per cent."

The first witness for the defendant was Dr. E. S. Hatch, who had first examined the plaintiff in April, 1931, for the Union Indemnity Company, which carried the defendant's employer's liability insurance. He appears to us to be very liberal in his opinion toward the plaintiff, but his testimony cannot convey any other impression but that, considering the length of time since the injury, union of the fractured bones has taken place and the fracture is as healed as it ever will be, and that, if he had no other injury than that revealed by the X-ray, there is no reason to believe that he is incapacitated. The last question he is asked is, "And then, if there is fibrous union, there is nothing to prevent this man from doing ordinary physical work?" to which he answers, "No sir; nothing that I can see."

Dr. H. Theodore Simon, who specializes in orthopœdic surgery, also examined the plaintiff in April, 1931. At that time he found no bony union of the fracture, but there apparently was fibrous union, and in this instance fibrous union was as good as bony union. Plaintiff's condition at that time, he said, would not incapacitate him from ordinary physical work.

Dr. H. R. Unsworth, neurologist and psychiatrist, examined plaintiff in June, 1931, and found him completely negative as far as injury or impairment to his nervous system was concerned, either organically or functionally. When asked to examine the position of the transverse processes from the X-ray plate and to state whether they could cause a pressure on any nerve of the body, he answers that there is no nerve there to be pressed on. He knows of no reason why plaintiff could not do ordinary manual work.

Dr. Joseph Menendez, according to the record, gave the plaintiff more attention than any other physician. He saw him twice in March, several times in April, and again in June, 1931. He goes into some detail about his examination and the nature of the injury. He agrees with Drs. Hatch and Simon that it is not necessary for a bony union to be complete in a fracture of the transverse processes for them to serve their purposes; a fibrous union being sufficient. He found no clinical reason why the muscular movement of that part of the body would give any pain. All in all, his testimony leaves no doubt as to his conviction that plaintiff's injuries have entirely healed and that he thereby suffers no disability.

This comprises all the medical testimony in the case with the exception of that of Dr. E. R. Bowie, who made the X-ray plates used in the trial of the case and whose testimony otherwise does not throw much light on the particular point involved.

We have carefully weighed and considered the testimony of all the doctors who testified. There is no reason why the testimony of any one should be given more weight and consideration than that of any of the others. Viewed as a whole, it cannot be said that it presents a case that is favorable to the plaintiff. If there is a preponderance of the testimony, it would seem to be on the side of the defendant. True, the district judge found in favor of the plaintiff, and ordinarily his finding would be entitled to great weight, but his reasons for judgment themselves show that he was influenced as much by equitable considerations as by what was disclosed by the evidence. As a matter of fact, his award of compensation for a period of 150 weeks is based on what he states is a fair and equitable adjustment to both sides. Be his opinion what it may, such a judgment cannot be supported under the compensation statute in this state in a case like the present where the plaintiff seeks compensation as for total disability. If there was disability as contended by plaintiff, it had to be either total or partial, in either of which cases there is no provision in the law fixing compensation at the period decreed by the district judge.

Our conclusion, however, is that the plaintiff has failed to make out a case with that legal certainty required by law, and that the judgment of the lower court is erroneous in having allowed him any compensation whatsoever.

For these reasons, it is now ordered, adjudged, and decreed that the judgment of the lower court be, and the same is hereby, set aside, annulled, and reversed and it is further ordered that there be judgment herein in favor of the defendant, Louisiana highway commission, and against the plaintiff, Roy E. Davis, rejecting his demands and dismissing his suit.